4-11-0373. Council, please. Good morning. Brad Elwood on behalf of St. John's Hospital. We're asking this Court to reverse the Commission Majority Decision in this case and to deny benefits for this accident. In a nutshell, this is a case where the plaintiff was walking down a set of stairs in a parking lot. She caught her shoe heel on a non-skidded surface of the stairs and fell. There was a video that was offered into evidence by, I believe, the petitioner in this case, and it depicts how this accident took place. And when you watch that, re-watch that, it becomes very clear that this individual was just walking down the stairs. She turned to speak with a coworker about what we don't know, and as she was turning, she continued to walk down the stairs. She caught the heel of her shoe on the top step and fell. And I think when we look at the dissenting Commissioner's comments, I think there's one comment that really rings true in this case. The dissenting Commissioner said, catching one's shoes on a non-skid tread is a risk that everyone in this accident was related to the petitioner's employment. Now, I think we can look at this case, we can look at three different aspects of this case. First of all, we can look at was this stairway, was this step, was this tread defective? Second, was there a risk presented by this? And third, what is it about the use of this for the work, as the Commission calls it, that might have caused an increased risk? And if we could look at those very quickly, we can say, was this stairway or this tread defective? And I think the answer to that is abundantly no, it was not. The evidence from the petitioner, from her witness, Fisero, from Mr. Caldwell, who was also a witness, and from the maintenance supervisor, Mosher, shows that there was nothing wrong with the stairs. When she did the video, at one point, I believe she testified, I have to turn the volume up quite a bit, but at one point she says the stairs in the video represent how they were when she fell. When you look at that, you can see you have adequate lighting, there's no debris, there's no water, there's nothing to show a defective condition. Second, we can also look at Mr. Mosher's testimony, as a supervisor of maintenance, he says that these stairs and treads were code compliant. He's a security supervisor. Yes. There was no foundational testimony that he knows anything about any codes, do you agree? Yes, that's true. His testimony did indicate that part of his responsibilities were to oversee maintenance. To oversee maintenance. That's correct. There was no foundational testimony that he knew what building codes were. No, he was asked one question, the question was, to your knowledge, does the stairwell comply with all codes? He said yes. Yes. That's the only evidence in the case that it was code compliant. Right, there were two comments that he made with respect to that, but yes, there was no foundation, nothing with respect to, are you an expert in codes? We don't know anything about it or not, just to his knowledge. That's correct. So when you argue in your brief and everything that this was a fully code compliant stairwell, that's what you're going on. That's exactly true, and there was no evidence offered by the claimant to indicate that it was not in compliance. So yes, that's a fair point. Let me ask you a question, could the commission find that having a traction strip that's raised above the level of the concrete upon which one could catch one's heel to be defective, a defective condition? Why can't the commission find that? I don't think that, well one, what they said is they didn't call it defective, they said a slightly raised nature of the tread made it a risk or an increased risk. Okay. So I don't think there's anything in the evidence to the record to indicate that there was a defect. I mean, one of the problems I think when we have this case is we look at and we focus heavily on the defective nature or is there an inherent risk associated with the stairs. I gave this a lot of thought and I think we could probably safely say that most things have an inherent risk factor to them. I mean even the threshold when you walk into this courtroom from the flat tile to the threshold, if you want to say that there's a slightly raised nature of the threshold, I think we can safely say that there's probably an inherent risk in anything. But I think that will become a question of fact, Mr. Albert. Well on that question perhaps so, but I think here again we have to remind ourselves that we have a, according to the evidence, a code compliant, non-defective in any other way stairs. But rather than get hung up on the defective or the inherent risk, I think we need to move to the second factor of this and say is this a risk, if we assume it's a risk, is this a risk that she faced to a greater degree than other members of the general public because of her employment? And I think that's where this case falls apart. And I think so if you assume, Your Honor, that there is a risk inherent in this, inherent in everything, and inherent in this and we accept that, we go on and say what is it about the use of the stairs, as the Commission said, that creates this increased risk? And I think... Quantitative rather than First of all, we see that the stairs were open to the general public. Now granted, it was limited access and we acknowledge that in our brief. And everybody said rarely did the general public ever use them. That's true, but I think the question is was it open to the public? It was coming down. Had this been a case where the petitioner was going up the stairs, the key access becomes a factor. I think we have a completely different case. I have a very hard time in that case because I think you have limited access as used. But we don't have limited access as used in this case because she's coming down like anyone else in the general public can. She's coming down the stairs and she turns, she's going to talk to one of her friends, we don't know what about, and she catches her heel and falls. As I understand the evidence, the general public, it was open for the general public to come down the stairs. However, coming down those stairs didn't go anywhere the general public would want to go. You have to go to the other side of the parking garage to go to the hospital is kind of the way I understood the record. But it does take you from the second down to the third. I mean, it does take you down. It goes somewhere. That's why the general public rarely used it. Right, were there other options? You'd have to have a key card to get in at the bottom. Yes, absolutely. The record says it, absolutely. And so I think when we look at that, we can say this is open for the purposes as it was being used by her. The second, as the Honor had mentioned, we had the aspect of frequently encountering. The evidence that she testified to was I have these meetings monthly, sometimes more she says, but she doesn't say how many more, whether it's the water reclamation case where we had an individual encountering the dip three times a week. We don't have any evidence that shows more than one really encounter with this condition, and that's on a monthly basis. And I think the thing that bothers us as the employer in this case is we have a step. The step, according to our perspective, according to our evidence, is code-confined. No evidence of an effect. This is a situation that could happen to anybody at any time in any spot where they would encounter a set of stairs with concrete, with that type of tread. The question is, though, is it more likely to happen to her than to someone in the general public? I don't think they've established that. Is there increased risk of going down those stairs more often than the general public, certainly under the evidence? Once a month. Maybe two. We don't have anything over that we know of that's once a month. That's an increased risk for the general public, is it not? I wouldn't say that. If someone goes to dinner and they park in a parking deck and they come down the parking deck to go to the first floor to walk to the restaurant, they've encountered it once, maybe twice, but going back up. If someone goes to the Prairie Capital Convention Center and they're going up and down the bleachers, you go to a basketball game, you go to the Bradley basketball game, you go to the Horizon in Chicago. There's so many different places that we encounter this. You may go for a month or two without. You may have a month where you encounter it several times. But it's something that happens to people in the general public. You're going down a step, turn to talk to somebody, and you catch your heel. Again, that video really describes it well. It really shows it well. You can see how her foot catches. Whether her foot would have caught on a step without a tread, I don't even know if you could make the conclusion that her foot would have caught regardless of whether there was a tread. It looks to me like the little part of the foot catches on the rollover as she's coming down. It's going to catch on whatever's there, regardless of whether there's a string. So we think that this is a case that can be reversed. We think that this could be evaluated on a de novo basis. We don't really see a whole lot of disputes in any of the material facts. Alternatively, we would fall back on the way. And again, it's our position that an employer should not be subject to liability where there are no defects in a property, where the property is in compliance with the code, and where there's a common risk that everyone in the general public faces. For those reasons, we ask the court to intervene and reverse. Thank you. Members of the court, counsel, we do believe that the correct standard is the manifest weight. There are some issues as to the mechanism of injury, and for that reason, we do not believe this is a de novo review. We had videotaped, we had photographs of the area where the petitioner fell. We have her testimony, we have the testimony of co-workers describing how it happened. And this, please keep in mind that there was a slight change between the arbitrator's decision and the commission, only to the extent that the arbitrator emphasized activities that were occurring simultaneously with the claimant taking this step. The commission felt that those other activities, talking to a co-worker and carrying materials from the meeting, weren't important and did not create the risk as much as the condition of the step. And in particular, this traction strip. Mr. Ellard emphasizes quite extensively that the stairs were in compliance with the code. I don't know if that precludes a defect developing, but what is it about the stairs in particular that gave rise to a defect or would make some defect? Well, I think there's a difference between a code violation, and I don't think there's any requirement that we prove that an area where someone has an injury does not comply with the code. Does it create a hazard? And I think the commission felt that, and I think the argument is that the fact that this strip was slightly raised did increase the risk of somebody, and in this case an employee who used these steps frequently would catch her foot and lose her balance. And then the next step was she had no idea where the next step was, stair was, and lost her footing and fell. So I think that the hazard that the commission is referring to is the fact that this traction strip was slightly raised. As far as the frequency, there was testimony, as Mr. Ellard pointed out, that she attended these meetings a month, each month, or maybe more. And she didn't really specify how often, other than once a month. I think, too, it's important to consider the fact that the hospital complex is set up in such a way that the offices and the areas where employees are required to go in the course of their employment is spread out. It's not all in one building, and the employees are required to travel from one building to another to perform their job duties. And in this case, as Your Honor pointed out, this is not just a stairway that is used as often or as frequently by the general public as employees for several reasons. One is the proximity of the stairway to the hospital facility itself. It just doesn't make sense if you look at the video and the photographs for an individual visiting someone at the first floor through the doorway leading to the hospital and then took the elevator to whatever floor they were going to. To then come out on that floor and go to this stairway to get to their cart would make absolutely no sense whatsoever. In fact, they probably weren't even aware that the stairway existed because they took, theoretically, the elevator to get to whatever floor they were going to. So for that reason, we feel that there is clearly a difference between the risk that an employee and, in particular, this claimant had versus the general public. Your opponent refers to first task as being support for his position. I noticed in your brief correctly, you don't even mention first task. I believe we did, Your Honor. If not, that case is distinguishable, and I'm surprised we didn't if we didn't. Unless your pages are fair and incorrect, you did not even mention it. We talk about it briefly on page 11, Your Honor, and that was a case where I believe the claimant was unable to explain what caused her to slip on a ceramic floor. And for that reason, I can't identify what caused her to lose her footing and fall. And so, again, I think you have to give some reason, even though an unexplained fall might be considered compensable under certain circumstances versus idiopathic, to be unable to say what mechanism of injury or what mechanism caused the injury to occur is saying I really don't know what caused me to fall. Other than the next thing I knew, I was on the ground. And I think those were the facts in first case financial. There are so many other cases that were cited by both counsel for the respondent and for the claimant that are similar, but in some ways distinguishable. And the one case that was most distinguishable was leaving work, walking on a waxed floor in a mall, and slipped and fell. This is an area that's open to the general public. There's no restrictions on access to the floor in the mall, unlike the present case. And so the Commission correctly concluded that there was no increased risk of harm in that situation. The Metropolitan Water Reclamation case, of course, is a case we do cite. And that's a case where an individual was exposed to a dip which created a hazard, but was certainly not, there was no evidence that it was defective or not in compliance with code, but it created a hazard. But it was also a hazard that the general public would encounter on a public sidewalk. And so in Metropolitan Water, they go over a lot of the previous case law, including IIT, to determine whether the type of hazard that this individual was exposed to actually arose out of her employment. And concluded that it did, because of the frequency at which this individual was required to traverse this area. And I think the concern would be that by saying, hey, it doesn't matter what happened, as long as it happened while you're at work, we would be asking this Court to adopt the positional risk doctrine. I don't think that's what we're asking, Your Honors. I think we're asking this Court to simply apply the standards set forth in IIT and Metropolitan, and determine whether when an individual is exposed to a neutral risk, their employment increases the risk of that, of an injury to occur versus the general public. And we feel that the evidence in this case supports that, and we would ask that the decision of the Commission and the Circuit Court be adopted. How does the employment increase the risk? The nature of the hospital complex and the fact that employees are required to go from one building to the other increases the risk, as well as the limited access that the general public has to this stairway, and the fact that this individual was carrying material while she was attempting to go down the steps and speaking to a coworker. Those are all activities that occurred that were part of her employment. Those activities were dismissed by the Commission, though, correct? That is correct. They focus more on the fact that this traction strip was raised. Thank you. Judge Barber, please. The thought I'd like to leave the Court with, I've read a lot of these cases over the years dealing with increased risk in a variety of settings in comparison to the risk faced by the claimant versus the general public. My recollection of those cases, including the ones cited by counsel tonight, does not see the Court or the Commission getting into a numerical quantification of the general public. When the Court asks a question, is encountering this risk once a month or once on a plus, when she says maybe more, is that greater than the general public? I am not aware of any case that gets into a type of description of what the general public as a whole would encounter. And so I think it's a standard that we refer to. We are saying to ourselves, is a general person likely to encounter this in their normal day or have this risk face them? If we assume we have the risk of an increased risk because of the stair tread, is that something that any of us in the courtroom could encounter in our daily events? And the answer is yes, it is. And that's what we're asking this Court to do, is to take a look at this. I think with a case like this, there's a temptation to be very over-analytical about trying to nuance this type of case to death. But really, a woman who's walking down the steps, she turns to talk to a coworker, and her heel catches on a non-skid step. We have no evidence of any defect. And she can say, false. That can happen to anybody, anywhere, at any time. And we don't think that that responsibility or obligation to pay for that should be placed on the employer. Thank you.